IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CROMAN CORPORATION, | ) | |
| | ) | 2:05-cv-0575-GEB-JFM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER[*] |
| | ) | |
| GENERAL ELECTRIC COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Defendants General Electric ("GE"), Rotair Industries ("Rotair"), Sikorsky Aircraft Corporation, Helicopter Support, Inc. and United Technologies Corporation, (collectively "Sikorsky")[1] move for summary judgment or summary adjudication on Plaintiff's claims. Plaintiff opposes the motions.[2]

_____

[*]      This motion was determined to be suitable for decision without oral argument.  L.R. 78-230(h).

[1]      Hereinafter, "Defendants" refers to all five Defendants.

[2]      Plaintiff moves to strike Sikorsky's Reply, Objection to Evidence, Response to Plaintiff's Separate Statement of Facts and Declaration of Garry L. Montanari, (collectively "Reply") on the grounds that these documents were untimely filed under Local Rule 78-230(d). (Pl.'s Mem. in Support of Mot. to Strike at 2.)  The hearing date was set for September 18, 2006.  Defendant Sikorsky's Reply was due on September 11, 2006, but was filed on Wednesday, September 13, 2006.
(continued...)

BACKGROUND

Plaintiff is an Oregon corporation based in White City, Oregon.  (Pl.'s Second Amended Complaint ("SAC") ¶ 3.)  This action is the result of a helicopter crash that occurred in the Shasta National Recreational Area, California on March 26, 2002.  (SAC ¶ 12.)  At the time of the crash, the helicopter, a Sikorsky model S-61A, Registration No. NJ318Y, owned and operated by Plaintiff, was performing heli-logging.  (Pl.'s Resp. to Sikorsky's Undisputed Facts 1, 8, 9 at 2, 4-5.)

The Defendants are GE, who designed and manufactured the turbine engines and other component parts that were on the helicopter when it crashed; Sikorsky Aircraft Corporation and United Technologies Corporation, who designed and manufactured the helicopter; Helicopter Support, Inc., who supplied replacement parts manufactured by itself and others for the helicopter; and Rotair, who supplied parts manufactured by itself and others for the Input Freewheeling Units of the helicopter ("IFWUs").  (SAC ¶¶ 6-10.)

Plaintiff alleges the helicopter crash was caused by Defendants' "failure to design, manufacture, assemble, inspect, test, repair, market, supply, and introduce a safe product into the stream of commerce."  (Id. ¶ 12.)  Plaintiff also alleges Defendants "failed to warn (pre-sale and post-sale) the owners and operators of the helicopter, and the [Federal Aviation Administration ("FAA")], of

---

[2](...continued)
However, since the Court issued an Order cancelling the September 18th hearing, Plaintiff did not suffer any prejudice with regards to the delayed filings.  Accordingly, Plaintiff's motion to strike is denied.
        Sikorsky and Rotair move to strike the Declaration of Gregory Williams.  Mr. Williams' testimony is not pertinent to the issues decided.  Therefore, Sikorsky and Rotair's motion to strike is not reached.

1  dangerous and defective conditions with the helicopter" and that these
2  defects caused the accident.  (Id.)  Plaintiff filed a Complaint on
3  March 24, 2005, asserting causes of action against Defendants for
4  strict products liability, negligence and breach of express and
5  implied warranties.[3]  Defendants move for summary judgment on all
6  three causes of action.

7                              DISCUSSION
8  I. GARA Analysis
9       A. "General Aviation Aircraft"

10          GE and Sikorsky assert Plaintiff's claims are barred by a
11  federal statute of repose, the General Aviation Revitalization Act of
12  1994 ("GARA") 49 U.S.C. § 40101, note (Pub.L. 103-298, August 17,
13  1994, 108 Stat. 1552, as amended Pub.L. 105-102, § 3(e), November 20,
14  1997, 111 Stat. 2216).[4]  (Sikorsky's Mot. at 8; GE's Mot. at 4.)
15  Under GARA:

16               [N]o civil action for damages for death or
                 injury to persons or damage to property arising
17               out of an accident involving a general aviation
                 aircraft may be brought against the manufacturer
18               of the aircraft or the manufacturer of any new
                 component, system, subassembly, or other part of
19               the aircraft, in its capacity as a manufacturer if
                 the accident occurred–
20                    (1) after the applicable limitation
                      period beginning on–
21                         (a) the date of delivery of
                           the aircraft to its first
22                         purchaser or lessee, if
                           delivered directly from the
23                         manufacturer; or
                           (b) the date of first delivery
24                         of the aircraft to a person

---

26       [3]   Plaintiff has agreed to dismiss its breach of implied warranty
    claim against General Electric.  (Pl.'s Opp'n to GE at 6.)  Therefore,
27  this claim is dismissed.

28       [4]   Sikorsky's motion under GARA will be reached only as to claims
    against them in their capacities as manufacturers.

```
                              engaged in the business of
                              selling or leasing such
                              aircraft;
                              or
                         (2) with respect to any new component,
                              system, subassembly, or other part which
                              replaced another component, system,
                              subassembly, or other part originally
                              in, or which was added to, the aircraft,
                              and which is alleged to have caused such
                              death, injury, or damage, after the
                              applicable limitations period beginning
                              on the date of completion of the
                              replacement or addition.
```

GARA, § 2.

        For GARA purposes, the "applicable limitation period" is "18 years with respect to general aviation aircraft and the components, systems, subassemblies, and other parts of such aircraft."  GARA, § 3(3).  "General aviation aircraft" is "any aircraft for which a type certificate or an airworthiness certificate has been issued by the Administrator of the Federal Aviation Administration, which, at the time such certificate was originally issued, had a maximum seating capacity of fewer than 20 passengers, and which was not, at the time of the accident, engaged in scheduled passenger-carry operations . . . ."  GARA, § 2(c).

        For GARA to apply, GE and Sikorsky must show the helicopter and its parts were delivered to its first purchaser prior to March 26, 1984, more than 18 years before the date of the accident.  It is undisputed that the helicopter was delivered to its first purchaser, the joint ownership of Commonwealth Electric Company, Donavan Construction Company and Columbia Helicopters ("Commonwealth Electric Company"), on June 27, 1967.  (Pl.'s Resp. to Sikorsky's Undisputed Facts 13 at 6.)  It is also undisputed that the engine in question was manufactured by GE in 1968 and was purchased by Plaintiff in 1977.  (Pl.'s Resp. to GE's Undisputed Facts 8 at 4; Pl.'s Opp'n to GE at

15.)  Therefore, the subject helicopter and its parts were delivered more than 18 years before the accident.

GE and Sikorsky must also show the helicopter qualifies as a "general aviation aircraft," meaning its maximum seating capacity was less than twenty at the time an FAA airworthiness certificate or type certificate was originally issued and that the helicopter was not engaged in scheduled passenger-carry operations at the time of the accident.  GARA, § 2(c).  It is undisputed that at the time of the accident the helicopter was engaged in heli-logging; it was not then engaged in passenger-carry operations.  (Pl.'s Resp. to GE's Undisputed Facts 6, 7 at 4.)

The parties dispute which FAA airworthiness certificate is relevant to the determination of whether the maximum seating capacity was less than twenty.  On July 3, 1967, Commonwealth Electric Company filed an application with the FAA for an airworthiness certificate in the "restricted" category, which was subsequently received that same year.  (Pl.'s Resp. to GE's Undisputed Facts 3 at 3.)  On its face, the certificate states the aircraft airworthiness classification is "restricted" and directs the reader to "[s]ee reverse side." (Sikorsky Ex. E.)  The reverse side explicitly states "Special Purpose: Transportation of cargo in the furtherance of operators' or lessees' business only."  (Id.)  Since the aircraft could only transport cargo, passengers were not permitted on the aircraft. Furthermore, the FAA's "Operating Limitations" for the "Restricted Category Aircraft" states in paragraph 5: "Persons other than the minimum crew necessary for the [special purpose] operation shall not be carried during these operations."  (Sikorsky Decl. Ex. F, ¶ 5.)
/////

1    Plaintiff counters that the only FAA certificate relevant to

2  whether the helicopter is a "general aviation aircraft" is the

3  helicopter's first airworthiness certificate, issued in 1962, in the

4  "experimental" category.  (Pl.'s Opp'n to GE at 14; Pl.'s Opp'n to

5  Sikorsky at 19.)  GARA does not support Plaintiff's contention that

6  "maximum seating capacity is determined at the time the aircraft

7  received its _first_ airworthiness or type certificate."  (Pl.'s Opp'n

8  to Sikorsky at 19 (emphasis added); _see also_ Pl.'s Opp'n to GE at 14.)

9  Instead, "'general aviation aircraft' means any aircraft for which a

10 type certificate or an airworthiness certificate has been issued

11 by . . . [the FAA], which, _at the time such certificate was originally_

12 _issued_, had a maximum seating capacity of fewer than 20

13 passengers . . . ."  GARA § 2(c). (emphasis added).

14    The definition of "original" "as related to the issuance of

15 airworthiness certificates" refers to a situation, where, like the

16 instant case, a subsequent airworthiness certificate was issued to the

17 same aircraft in another classification.  FAA Order 8130.2F.

18 "Airworthiness Certification of Aircraft and Related Products"

19 prescribes: "The term 'original certificate' applies . . . for the

20 following: . . . Aircraft that previously have been issued an

21 airworthiness certificate and presented for certification in another

22 category or classification, for example, aircraft converted from

23 standard to restricted for the first time or from special

24 airworthiness certificate to standard for the first time."  (Sikorsky

25 Ex. D, FAA Order 8130.2F, ¶ 35(a)(3).)  Therefore, the 1967 restricted

26 airworthiness certificate is the relevant airworthiness certificate

27 for determination of whether the accident helicopter was a "general

28 aviation aircraft" under GARA § 2(c).

The parties also dispute the relevance of the fact that the aircraft's type certificate is silent with regard to the number of passengers. (Harting Decl. Ex. A.)  The helicopter's Type Certificate No. H2EA explicitly permits a maximum crew of two (a pilot and co-pilot) and is silent regarding the number of passengers. (Id.)  GE and Sikorsky argue the type certificate is silent on this issue because the transportation of passengers was simply not contemplated, as evidenced by both the helicopter's "experimental" and "restricted" category airworthiness certificates. (GE's Reply at 4 (stating "the S-61A type certificate is silent regarding passengers because it was classified in the 'experimental' or 'restricted' category which by FAA regulation precludes the carrying of passengers"); Sikorsky's Reply at 7 (stating "[i]t is redundant and needless to state the maximum number of passengers is zero").)

Plaintiff responds by analogizing to type certificates of other aircrafts, such as those of helicopter model number S-61L, S-61N and S-61R. (Pl.'s Opp'n to GE at 14-15.)  These type certificates either explicitly state the maximum passenger seating capacity and minimum crew or, in the case of helicopter S-61R, expressly provide that the maximum seating capacity is "none." (Harting Decl. Ex. B, Type Certificates for models S-61L, S-61N and S-61R.)  Plaintiff argues that "[h]ad the FAA or Sikorsky intended to limit the number of passengers on an S-61A to zero they could have easily done so in the same manner as they did for the S-61R." (Pl.'s Opp'n to GE at 15.)  GE and Sikorsky rejoin that the aircrafts with type certificates that explicitly stated the maximum seating capacity were classified in the "transport" category, whereas the subject helicopter was classified in the restricted category. (GE's Reply at 4; Sikorsky's Reply at 7.)

As a "restricted" category aircraft, the subject helicopter was only allowed to carry cargo, even though the type certificate was silent regarding the maximum number of passengers; thus, transportation of passengers was simply not contemplated.  The type certificates for other aircrafts in the "restricted" category are also silent regarding the maximum seating capacity and instead, only provide instructions regarding the maximum number of crew.  (See Harting Decl. Ex. A, Type Certificates for models S-61D, S-61E and S-61V.)

Plaintiff argues that an entry in the helicopter's 1967 maintenance logbook, which provided that the aircraft had installed "18 man troop seat[s]," is evidence that the helicopter had a maximum seating capacity of twenty passengers when the pilot and co-pilot are included.  (Pl.'s Opp'n to Sikorsky at 21-22.)  However, the pilot and co-pilot seats are not passenger seats.  Various provisions of the FAA regulations explicitly exclude pilot and co-pilot seats from the definition of the term "passenger seating."  See e.g., 14 C.F.R. § 135.77(a); § 29.807(d)(1) and (2); § 29.813(c)(1) and (2); and § 91.531(a)(3).  "Regular passenger seating capacity" is the "maximum number of seats that have at any time on or prior to the date of the flight been on the aircraft," but "[w]hen determining the regular passenger seating capacity of an aircraft, any seat occupied by a member of the flight crew . . . shall not be counted, unless the purpose of the flight by such individual is not primarily to serve as a member of the flight crew."  26 C.F.R. § 1.61-21 (g)(12)(iii) and (v).

Furthermore, Corpus Juris Secundum, CJS § 7 (Aeronautics & Aerospace), defines "passenger" as "any person riding in an aircraft but having no part in its operation . . . ."  Accordingly, the pilot

and co-pilot are not "passengers" and thus even if seats for 18 troops were installed on the subject helicopter, it would still have a "maximum seating capacity of fewer than 20 passengers."  GARA, § 2(c).  Since the aircraft's "restricted" airworthiness certificate either did not permit the transportation of passengers onboard, or those passengers permitted were fewer than 20, the subject helicopter is a "general aviation aircraft" as defined in § 2(c) of GARA.  Therefore, GARA applies to this case.

Plaintiff argues that GE is not entitled to GARA protection because the GE engine that allegedly caused the accident was first installed on one of Croman's helicopters that could not be classified as a "general aviation aircraft."  (Pl.'s Opp'n to GE at 15.)  The subject engine was initially purchased in connection with Croman's first S-61 helicopter which was type certified for a maximum seating capacity of thirty-nine passengers.  (Id.)  Additionally, Plaintiff argues that the fuel manifold, the engine component at issue, was also originally installed on a non-general aviation aircraft.  (Id. at 16.)  Plaintiff argues that GE therefore "cannot acquire GARA protection by virtue of subsequent installation on some other aircraft since . . . GARA ties its definition of 'general aviation aircraft' and thus the 18-year limitation period, to the maximum seating capacity of the aircraft at 'the time such certificate was originally issued.'  Here, that type certificate is the type certificate for the aircraft for which the engine and fuel manifold were originally sold."  (Id. at 17.)

Plaintiff does not cite any authority for this position.  GE counters that "[a] GARA analysis does not concern the status of the aircraft or its components at the time the aircraft was first

delivered, but rather concerns the aircraft's status at the time of the accident."  (GE's Mot. at 9 (citing Kennedy v. Bell Helicopter Textron, Inc., 283 F.3d 1107, 1112 (9th Cir. 2002)).)  Kennedy supports GE's position.  In Kennedy, the issue was whether GARA was triggered when the accident helicopter was delivered to the Navy, its first purchaser, more than 18 years before the accident date, or when it received its first type and airworthiness certificates, which was less than 18 years before the accident.  283 F.3d at 1112.  Since the helicopter was first a military aircraft, it was not required to have any such certification.  Id.  The Ninth Circuit stated that "the plain language of GARA . . . supports [the defendant's] position that the limitations period is triggered by the initial delivery of the aircraft, even if the aircraft cannot be considered a general aviation aircraft at that time."  Id.  Likewise, the limitation period for GE's engine and fuel manifold is also triggered by their initial delivery to the purchaser, even if the aircraft in which they were first installed was not considered a general aviation aircraft.

        "Under GARA, an aircraft cannot fulfill the definition of general aviation aircraft until an accident occurs because one condition which must be met in order for an aircraft to qualify as a general aviation aircraft is that it 'was not, at the time of the accident, engaged in scheduled passenger-carrying operations as defined under [Federal Aviation Act regulations].'"  Id.  Therefore, the relevant focus under GARA when determinating whether an aircraft meets the definition of a "general aviation aircraft" is the accident aircraft; not other aircrafts in which the engine or other components were previously installed.

/////

B. Failure to Warn

Plaintiff argues that Defendants failed to warn "the owners and operators of the helicopter, and the FAA, of the dangerous and defective conditions with the helicopter." (SAC ¶ 12.)  GE and Sikorsky respond that these claims are barred by GARA. (GE's Mot. at 10; Sikorsky's Mot. at 15.)

Plaintiff argues that GE did not warn of the failures of the stainless steel fuel manifold, a part of the allegedly defective engine that was in the accident helicopter. (Pl.'s Opp'n to GE at 19.)  The accident helicopter was still equipped with the stainless steel fuel manifold, even though GE had designed a new manifold made out of Inconel 625, which has "a higher tolerance for stress and [is] more resistant to cracking." (Id. at 20 (citing GE's Mot. at 4).) Plaintiff contends that even though the new Inconel 625 fuel manifold was "promptly incorporated into all of the military T58 engines using the same style manifold[,]" it had not been made mandatory for civilian operators prior to the accident, and civilian repair shops were not "notified of the design change or the reason for it." (Id.) Further, Plaintiff argues that after the accident, GE issued a Service Bulletin in which it "notified the FAA and advised all commercial civilian operators of the need to change to the Inconel 625 manifolds." (Id.)

GE responds that as of 1993, Plaintiff was aware that there had been a number of fuel manifold failures in both commercial and military fleets and that GE had introduced the new Inconel 625 fuel manifold. (GE's Reply at 9-10.)  Plaintiff rejoins that the information it had acquired was inadequate. (Pl.'s Opp'n to GE at 22.)

1    Failure to warn claims are usually barred by GARA.

2  "Congress has clearly occupied the field in this area and GARA bars

3  claims based on a breach of a manufacturer's duty to warn . . . ."

4  Burroughs v. Precision Automotive Corp., 78 Cal. App. 4th 681, 699

5  (2000).  Plaintiff's failure to warn theory of liability is unavailing

6  since it amounts to an assertion that GE breached "an alleged

7  continuing duty to upgrade and update."  Lyon v. Agusta S.P.A., 252

8  F.3d 1078, 1088 (9th Cir. 2001).  However, as the Ninth Circuit stated

9  in Lyon: "[w]ere that so, GARA would have little value to

10 manufacturers because the plaintiff could always argue that an 18-year

11 period commenced if the manufacturer did nothing at all, while

12 simultaneously arguing that if the manufacturer did something that,

13 too, would start a new 18-year period running.  That is not the

14 law . . . ."  Id.  Accordingly, GE has shown that, as a matter of law,

15 Plaintiff's failure to warn claim is barred by GARA.

16    Sikorsky also argues that GARA bars Plaintiff's claim that

17 Sikorsky knew or should have known that the IFWUs, a component of the

18 main gearbox, would not work and that they failed to issue any warning

19 to Plaintiff or the FAA.  (SAC ¶ 12; Sikorsky's Mot. at 15.)  This

20

21 failure to warn theory of liability "does not allow [Plaintiff] to

22 bypass the GARA bar."  Lyon, 252 F.3d at 1088.  Therefore, this claim

23 is also barred by GARA.

24 C.  Misrepresentation or Concealment Exception to GARA

25    Plaintiff argues its claims against GE are exempt from GARA

26 under the statute's misrepresentation or concealment exception.

27 (Pl.'s Opp'n to GE at 23.)  GARA § 2(b)(1) states that GARA's statute

28 of repose does not apply:

1      if the claimant pleads with specificity the facts
2      necessary to prove, and proves, that the
    manufacturer with respect to a type certificate or
3      airworthiness certificate for, or obligations with
    respect to continuing airworthiness of, an
4      aircraft or a component, system, subassembly, or
    other part of an aircraft knowingly misrepresented
5      to the Federal Aviation Administration, or
    concealed or withheld from the Federal Aviation
6      Administration, required information that is
    material and relevant to the performance or the
7      maintenance or operation of such an aircraft, or
    the component, system, subassembly, or other part,
8      that is causally related to the harm which the
    claimant allegedly suffered.

9      GE counters that "plaintiff has never pled in its twice

10 amended complaint a cause of action for misrepresentation or

11 concealment of information from the FAA or any specific facts

12 supporting such a claim; in fact, plaintiff never even hinted that

13 such contentions were at issue.  Plaintiff has thus not pled with

14 specificity as required by GARA § 2(b)."  (Def. GE's Reply at 11.)

15 Plaintiff raises the misrepresentation or concealment issue for the

16 first time in its opposition to GE's motion for summary judgment.

17 (See Pl.'s Opp'n to GE at 23.)

18     "[P]laintiffs seeking to toll the statute of limitations on

19 various grounds must have included the allegation in their pleadings;

20 this rule applies even where the tolling argument is raised in

21 opposition to summary judgment." Wasco Products, Inc. v. Southwall

22 Technologies, Inc., 435 F.3d 989, 991 (9th Cir. 2006) (citation

23 omitted).  GARA's requirement that claims of misrepresentation or

24 concealment be pled with particularity "is an obvious analog to

25 Federal Rule of Civil Procedure 9(b) which requires that parties plead

26 fraud 'with particularity.'"  Rickert v. Mitsubshi Heavy Industries,

27 Ltd., 923 F. Supp. 1453, 1456 (D. Wyo. 1996).

28 /////

Plaintiff has not pled in its Complaint facts giving rise to a claim of misrepresentation or concealment as required by § 2(b) of GARA.  This claim could have been pled in Plaintiff's Second Amended Complaint since Plaintiff was on notice of the GARA defense pled in GE's Answer.  Plaintiff cannot raise this tolling issue at this stage of the proceeding without showing that "good cause" justifies allowing amendment of its Complaint.  "The pretrial Status Conference Order [filed August 1, 2005,] preclude[s] [Plaintiff] from raising [this] new theory of relief at the summary judgment stage." Eagle v. American Tel. & Tel. Co., 769 F.2d 541, 548 (9th Cir. 1985).  The Order provides that "[n]o further . . . amendments to pleadings is permitted except with leave of Court, good cause having been shown." (Status (Pretrial Scheduling) Order at 2.)  Therefore, Plaintiff's claims against GE and Sikorsky, as manufacturers, are barred under GARA.

II. Causation

Rotair and Helicopter Support, Inc. ("HSI")[5] challenge the sufficiency of physical evidence on which Plaintiff relies as support for its causation theory.  (Rotair's Mot. at 11; Sikorsky's Mot. at 19.)  A plaintiff must prove causation in strict liability just as in negligence liability. Thomas v. Lusk, 27 Cal. App. 4th 1709, 1717 n.3 (1994) (citing Garman v. Magic Chef , Inc., 117 Cal. App. 3d 634, 638 (1981)).  Additionally, "[i]n a breach of warranty action, plaintiff may recover only after demonstrating that a warranty existed, that defendant breached that warranty and that the breach proximately

_____

[5]    Since HSI is sued as both a supplier and a manufacturer, the claims against it as a supplier must be reached.

caused the loss sustained." <u>Pisano v. American Leasing</u>, 146 Cal. App. 3d 194, 198 (1983).

Plaintiff contends that the helicopter crashed as a result of the failure of the right engine's fuel manifold, which caused a fire and a total loss of power in that engine. (Pl.'s Reply to Sikorsky's Undisputed Facts 12, 14 at 27.) Plaintiff further contends that as a result, the main rotor system's load was transferred to the remaining engine. (<u>Id.</u> 30 at 22.) Plaintiff argues "after the failure of the No. 2 (right) engine, one or more rollers in the No. 1 IFWU slipped or spit out, causing the left engine to overspeed and shut down."[6] (Pl.'s Opp'n to Sikorsky at 10.) Plaintiff asserts that HSI and Rotair manufactured and supplied defective components for the IFWU. (SAC ¶¶ 7-8, 10.)

Plaintiff cites his expert George E. Heath's ("Heath") Investigation Report when commenting on the evidence remaining after the crash:

> Because the post-crash fire left all the components of the IFWU heavily contaminated with an oxide layer, and other fire-related debris, very aggressive cleaning processes were employed by Sikorsky during the NTSB [National Transportation Safety Board] investigation. This cleaning process for the camshaft, rollers, roller retainers, and gear housing could have removed metal and caused the loss of spit-out evidence.

(Pl.'s Opp'n to Sikorsky at 32 (citing Heath's Investigation Report).) Nevertheless, Heath maintains the spit-out "remains the most probable explanation for the loss of the #1 engine power . . . ." (<u>Id.</u> at 32, Montanari Decl. Ex. N.) When Heath was asked about this explanation

_____

[6]   An IFWU is a component of the helicopter's model main gear box ("MGB"). (Sikorsky's Mot. at 3.) It is "an overrunning clutch mechanism that allows an engine to engage or disengage from the main rotor." (<u>Id.</u>)

15

at his deposition, he stated that the only physical evidence that supports the spit-out theory is oilite contamination.  Heath's deposition testimony concerning this explanation follows.  "Other than what you are claiming to be oilite debris, was there any physical evidence of spit-out or slippage in this case?"  Heath's response: "Nothing remaining."  (Rosen Decl. Ex. D.)

         Heath's theory is that the alleged IFWU failure is most likely attributed to the IFWU oilites "which have been implicated in previous IFWU failures."  (Kallet Decl. Ex. B.)  However, Heath's analysis regarding the oilites is inconclusive.  He opined that "physical evidence shows melting on the edge of the oilite supports and oilite deposit on the contact face of the roller retainer," and that "the general appearance of the oilite material under low power optical microscope examination is abnormally porous."  (Rosen Decl. Ex. D.)  However, Heath was unable to conclude whether the abnormal porosity is due to "incipient melting from fire damage" or "nonconformity of material" or "both."  (Id.)  Accordingly, Heath conceded that further testing would be needed to conclusively establish the cause of the oilite damage.  Heath was asked "[w]hat further testing or analysis would have to be done to determine whether [the abnormal porosity] was due to melting or material nonconformity?" Heath replied: "Well, there's been no destructive testing of the oilites done to date by anyone.  And I think there would be a sectioning required, mounting an examination, doing material analysis of the interior section of it that hasn't been exposed, and possibly some other physical or chemical tests to see if it's conforming." (Rosen Decl. Ex. D.)

/////

1      Plaintiff also argues that Heath's employer, R.J. Waldron &

2 Co. Ltd., "has investigated eight S-61 accidents, including this one,

3 since 1993.  Six of these accidents are either known or suspected to

4 be caused by IFWU failures."  (Pl.'s Opp'n to Sikorsky at 32 (quoting

5 Heath's report).)  In addition, "[t]wo previous S-61 accidents are

6 known to have been caused by both input freewheel units failing

7 approximately simultaneously" and "[t]he general circumstances and the

8 flight profile of this accident are substantially similar to the other

9 IFWU caused accidents."  (Id.)  Heath states that in his experience,

10 "IFWU failure is the leading cause of S-61 loss of engine power, and

11 the most probable cause of complete loss of power in this case."

12 (Id.)

13      "Under California law, tort plaintiffs cannot recover if

14 there is only a mere possibility that defendant's actions caused the

15 wrong."  Beech Aircraft Corp. V. United States, 51 F.3d 834, 838 (9th

16 Cir. 1995).  Furthermore, "a 'possible cause only becomes probable'

17 when, in the absence of other reasonable causal explanations, it

18 becomes more likely than not that the injury was a result of its

19 action . . . .'"  Id. (quoting Simmons v. West Covina Medical Clinic,

20 212 Cal. App. 3d 696 (1989)).  In this case, Plaintiff's evidence only

21 amounts to "a mere possibility that [Defendants'] actions caused the

22 wrong."  (Id.)  The evidence presented by Plaintiff's expert regarding

23 the oilites is not sufficient to establish that it was the probable

24 cause of the accident given the presence of another reasonable causal

25 explanation; in particular, the fact that the "abnormal porosity" of

26 these oilites could have been caused by the fire and not a defect in

27 the part itself.  (See Rosen Decl. Ex. D.)

28 /////

1        Furthermore, Plaintiff's evidence regarding IFWU failures in

2   previous accidents involving S-61 helicopters is not sufficient to

3   buttress its argument that the accident in this case was caused by

4   IFWU failure.  Plaintiff has not shown how "the general circumstances

5   and flight profile of this accident are substantially similar to the

6   other IFWU caused accidents."  (Id.)  In addition, Heath confirmed

7   that he had never seen or known "of suspected failure of freewheel

8   units in a 23,000 series gearbox," the MGB on the subject helicopter.

9   (Montanari Decl. Ex. C.)

10       Expert opinions must be based on a "sufficient quantum or

11  quality" of evidence to create a genuine issue of material fact on the

12  question of causation; in particular, that a defect existed in the

13  IFWU that caused the accident.  Triton Energy Corp. V. Square D Co.,

14  68 F.3d 1216, 1222 (9th Cir. 1995).  Plaintiff's evidence

15  does not satisfy this requirement.[7]  "At best its evidence merely

16  suggests this is a . . . possibility."  Id. at 1221.

17                              Conclusion

18       For the stated reasons, GARA bars Plaintiff's claims against

19  GE and Sikorsky.  Further, a genuine issue of material fact does not

20  exist requiring trial on the issue of whether a defect in a component

21  part allegedly supplied by either Defendant Rotair or HSI caused the

22

23  _____

24       [7]   Plaintiff also argues there is "evidence that the left IFWU
    rollers were not in compliance with design specifications, both as to
25  size and hardness."  (Pl.'s Opp'n to Rotair at 21.)  The testimony on
    which Plaintiff relies is inconclusive as to whether any Defendants were
26  responsible for a defect in the rollers.  (Rosen Decl. Ex. H.)
    Furthermore, Heath stated that "[t]he fact that the rollers were all
27  found to be under dimension could be the result of the cleaning
    process." (Pl.'s Opp'n to Sikorsky at 32 (citing Heath's Investigation
28  Report).)  Finally, it has not been shown how these alleged defects
    caused the accident.  (Rosen Decl. Ex. H.)

                                   18

accident.   Therefore, summary judgment is entered in favor of
Defendants.   The Clerk of Court is directed to enter judgment for
Defendants.

      IT IS SO ORDERED.

DATED: November 2, 2006

GARLAND E. BURRELL, JR.
United States District Judge